IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 1:18-cr-239-WKW-GMB |
| | ) | [WO] |
| DARRYL MESTRE | ) | |
| EDDY BERMUDEZ | ) | |

**<u>REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE</u>**

Pending before the court are motions to suppress filed by Defendants Darryl Mestre (Doc. 34) and Eddy Bermudez (Doc. 38). The Government filed an opposition brief (Doc. 41), and the court held an evidentiary hearing on the motions on August 22, 2018. After careful consideration of the parties' submissions, the evidence heard at the hearing, and the relevant law, and for the reasons stated herein, the undersigned Magistrate Judge RECOMMENDS that the motions to suppress (Docs. 34 & 38) be DENIED.

## I. INTRODUCTION

A Grand Jury sitting within the Middle District of Alabama indicted Mestre and Bermudez on seven counts: one count of possession of device making equipment, five counts of aggravated identity theft, and one count of possession of a controlled substance. Doc. 4. The defendants claim in their motions to suppress that the Government obtained the critical evidence supporting the charges by conducting an unlawful search of their vehicle. Docs. 34 & 38. The defendants assert that the investigative officers (1) unlawfully detained them without reasonable suspicion or probable cause and (2) illegally extended their detention to conduct a canine sniff to justify the search.

## II.  FACTS

During the evidentiary hearing on the motions to suppress, the court received testimony from Lance Hughes, a Dothan, Alabama police officer. Doc. 56.  The facts set forth in this recommendation are based on the testimony at the suppression hearing and body camera footage recorded by Officer Hughes at the time of the incident.  On April 20, 2018, Hughes saw two men standing outside of a Nissan Armada parked in the Dothan Walmart parking lot. Transcript of August 22, 2018 Hearing ("Tr.") at 8.  The next morning, approximately 24 hours later, Hughes noticed that the vehicle remained in the same area of the Walmart parking lot. Tr. at 6–7.  This parking lot is adjacent to an abandoned steakhouse and is located in an area that experiences an abnormally high rate of breaking and entering of cars, drug activity, prostitution, and theft. Tr. 9.

Hughes decided to approach the Armada to check on the welfare of the occupants. Tr. at 30.  He began to walk toward the vehicle at 7:43:02 a.m.,[1] as indicated on the video recording obtained from his body camera. Gov't Ex. 1 at 7:43:02.  As he approached, Hughes sent out a "suspicious vehicle" call to dispatch. Tr. at 33.  Hughes noticed that the two men he had seen the day before, later identified as Mestre and Bermudez, appeared to be asleep in the car. Tr. 14.  The men were well dressed and sleeping in a nice car. Tr. 41.

After opening the back door of the Armada, Hughes told the men inside that he had seen them yesterday, and he asked where they lived. Gov't Ex. 1 at 7:43:29–7:43:58.  When

---

[1] The video recording includes an embedded time stamp.  Hughes testified that the time stamp represents Zulu Time, and that Zulu Time is five hours ahead of Central Standard Time. Tr. at 58–59.  For clarity, all times listed in this recommendation are derived from the time stamp but adjusted for the correct time zone based on Hughes' testimony.

they responded that they were from Tampa, Hughes asked what brought them to Dothan. Gov't Ex. 1 at 7:44:02–7:44:04.  Mestre told Hughes that they were "passing through" Dothan on the way to Birmingham to see a truck, and then would be returning to Tampa. Gov't Ex. 1 at 7:44:08–7:44:17.  Hughes testified at the preliminary hearing that he was suspicious of this response because people who are passing through will "stop, stretch their legs, pass through.  They don't sleep overnight in the Walmart parking lot.  The story didn't make sense." Tr. at 16.  Although Hughes testified that he "wasn't sure what crime [the men] had performed yet," he suspected that they were involved in some form of criminal activity, so at that point he knew that he "wanted to investigate further." Tr. 17 & 41. Specifically, Hughes wanted to understand "why they were still there and what they were doing." Tr. 64.

When Hughes again mentioned that he had seen Mestre and Bermudez in the parking lot the day before, Bermudez explained that they were supposed to meet someone in Dothan the previous day. Gov't Ex. 1 at 7:44:26–7:44:28.  Around this time, a second officer with the Dothan Police Department, Officer Beck, arrived on scene and walked to the back door of the Armada on the passenger side. Tr. at 16; Gov't Ex. 1 at 7:44:58.

Hughes asked Mestre and Bermudez for their identification so he could "check [them] out" to "make sure [they had] nothing crazy going on," and then they "would be on their way." Gov't Ex. 1 at 7:45:19.  Both men handed their driver's licenses to Hughes, who placed a call to dispatch for a warrant check and retained the licenses. Gov't Ex. 1 at 7:45:35.  Hughes told Mestre and Bermudez that they were free to get out of the vehicle while they waited. Gov't Ex. 1 at 7:46:06.  When Bermudez got out, Hughes told him to

3

face toward the car door so that he could pat him down for weapons. Tr. at 17; Gov't Ex. 1 at 7:46:10–7:46:19. Mestre asked whether he could retrieve his shoes from the front seat of the car, and Hughes acquiesced. Gov't Ex. 1 at 7:46:27. When Mestre pulled his shoes out of the car, Hughes noticed that the vehicle contained folded, brand new clothes with the price tags intact. Tr. at 18 & 40. Hughes then touched Mestre's arm to direct him to turn around, and patted him down. Gov't Ex. 1 at 7:48:16. After the pat down, Mestre walked to the back of the vehicle to join Officer Beck and Bermudez. Hughes again asked the men about their travel plans, and Bermudez indicated that they were meeting a man named "Mike" to see a truck advertised on the Offer Up mobile application. Gov't Ex. 1 at 7:49:29–7:49:53.

Hughes then walked around the Nissan Armada peering in the windows and asked the men if they had any weapons or drugs in the car. Gov't Ex. 1 at 7:50:35–7:51:18. They responded in the negative. Gov't Ex. 1 at 7:50:18. Two other officers eventually arrived at the scene in response to Hughes' call for a suspicious vehicle. Tr. at 32–33.

A short time later, Hughes received a call from dispatch indicating that Mestre and Bermudez had no active warrants. Gov't Ex. 1 at 7:52:17. This occurred approximately nine minutes after Hughes first made contact with Mestre and Bermudez. After receiving the call, Hughes again asked the men about their travel plans. Tr. at 61; Gov't Ex. 1 at 7:52:17. Bermudez said that they were supposed to meet a guy "here" in Dothan, while Mestre simultaneously said they were going to Birmingham. Gov't Ex. 1 at 7:52:07–7:52:13. Hughes again asked why the men were in Dothan and whether they were meeting a guy from Birmingham in the Dothan area. Gov't Ex. 1 at 7:52:49–7:52:54. Both men

said "no," so Hughes asked for further clarification about who they were meeting in Dothan. Gov't Ex. 1 at 7:52:54–7:52:58. Both men said they were meeting "the guy with the truck" in Dothan, and Bermudez then volunteered that there were two trucks. Gov't Ex. 1 at 7:53:00–7:53:08. Bermudez then offered that they were meeting someone in Dothan to see a truck, and then meeting another guy in Birmingham to see a different truck. Gov't Ex. 1 at 7:53:17–7:53:34.

At this point, Hughes asked Mestre and Bermudez, who still were standing near the Armada, "There's nothing weird in there?" Gov't Ex. 1 at 7:53:35. He immediately followed this question with, "Would you guys mind if we searched it real quick, make sure there's no dope in there?" Gov't Ex. 1 at 7:53:38. Mestre answered that there was no dope in the car. Gov't Ex. 1 at 7:53:40. Hughes again asked, "Do you guys mind if we search it?" Mestre responded, "Aw, no, but there's no dope in there." Gov't Ex. 1 at 7:53:43–7:53:45. Hughes asked, "Yes or no?" In response, Bermudez merely shrugged his shoulders. Gov't Ex. 1 at 7:53:47.[2]

Hughes then asked another officer at the scene for a pair of gloves, retrieved the gloves, and directed Mestre and Bermudez to walk away from their car and stand near one of the police cars. Gov't Ex. 1 at 7:54:30. Hughes retrieved his drug-detection dog, Xander, from his patrol vehicle, and walked Xander around the Armada. Gov't Ex. 1 at 7:55:47. Xander eventually sat down by the driver's door, his alert signal for the presence of drugs.

---

[2] It is unclear from this ambiguous response and the rest of the video recording whether Mestre and Bermudez intended to consent to the search. However, Mestre and Bermudez have argued that they did not give consent, and the Government—which bears the burden of proof on this issue—has not contested this assertion.

Tr. at 47; Gov't Ex. 1 at 7:56:20. Based on the time stamp on the video recording, Xander's alert signal occurred about four minutes after Hughes received the all-clear call from dispatch, and about 13 minutes after Hughes' initial contact with Mestre and Bermudez.

## III.  DISCUSSION

The defendants assert that the officers' search of their vehicle was unconstitutional because (1) they were detained even though the officers did not have reasonable suspicion that the defendants were engaged in criminal activity, and (2) the officers unlawfully extended the length of the detention in order to deploy a drug-detection canine unit. Docs. 34 at 1 & 38 at 2–4. The court disagrees. For the reasons to follow, the court finds that the defendants were detained, but that Officer Hughes had reasonable suspicion to detain them and did not unreasonably prolong the period of detention.

### A.    Detention

The first issue for the court's consideration is whether Hughes subjected Mestre and Bermudez to a "seizure" within the meaning of the Fourth Amendment by detaining them during their encounter in the Walmart parking lot. The Fourth Amendment to the United States Constitution ensures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A person is seized within the meaning of the Fourth Amendment where "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

There is a constitutional distinction, however, between consensual encounters with

law enforcement and brief investigatory detentions, commonly known as *Terry* stops. *E.g.*,
*United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006).   The Fourth Amendment
generally is not implicated where law enforcement officers approach an individual in a
public place or in a parked car to ask him a few questions. *Florida v. Royer*, 460 U.S. 491,
497 (1983); *Miller v. Harget*, 458 F.3d 1251, 1257 (11th Cir. 2006).   These are considered
to be consensual encounters because a reasonable person would feel free to walk away or
otherwise terminate the encounter. *See Royer*, 460 U.S. at 498.   But once a person is
detained—meaning that he would no longer feel free to leave—that person must be
afforded Fourth Amendment protections. *Mendenhall*, 446 U.S. at 543.

The factors that determine whether a reasonable person would feel free to terminate
an encounter with law enforcement include:

> whether a citizen's path is blocked or impeded; whether identification is
> retained; the suspect's age, education and intelligence; the length of the
> suspect's detention and questioning; the number of police officers present;
> the display of weapons; any physical touching of the suspect, and the
> language and tone of voice of the police.

*United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011).   "The ultimate inquiry
remains whether a person's freedom of movement was restrained by physical force or by
submission to a show of authority." *Id.*   Although not dispositive, the Eleventh Circuit
recognizes that the "retention of documents such as a driver's license . . . has been treated
as highly significant on the question of whether a seizure has occurred" because a defendant
could be arrested for driving without a license if he tried to leave. *United States v. Aponte*,
662 F. App'x 780, 785 (11th Cir. 2016).   "Examples of circumstances that might indicate
a seizure, even where the person did not attempt to leave, would be the threatening presence

of several officers, the display of a weapon by an officer, [or] some physical touching of the person of the citizen." *Mendenhall*, 446 U.S. at 554.

At the suppression hearing, the Government argued that Mestre and Bermudez were not subjected to a Fourth Amendment seizure, citing to *United States v. Cusick*, 559 F. App'x 790 (11th Cir. 2014). Tr. at 97–98.   The facts of *Cusick* are distinguishable.   In *Cusick*, several police officers were present and they asked the defendant for his identification, but the record did not establish whether the officers retained his identification documents. *Cusick*, 559 F. App'x at 792.   The officers did not impede the defendant's path, did not physically touch the defendant, and were "calm and non-threatening." *Id.*   Furthermore, the defendant consented to the search of his vehicle. *Id.* at 793.   On these facts, the court determined that the defendant was not seized by law enforcement. *Id.* at 792.

Here, based on the totality of the circumstances, Mestre and Bermudez reasonably would not have believed that they were free to leave, particularly while Hughes retained their driver's licenses. *See Mendenhall*, 446 U.S. at 543; *Aponte*, 662 F. App'x at 785. Hughes' initial interaction with them may have been a consensual encounter, but that encounter soon matured into a seizure.   Shortly after the beginning of their conversation, another officer appeared at the passenger's side door. Tr. at 16.   Hughes then asked for and retained the defendants' identification cards. Gov't Ex. 1 at 7:45:19.   Unlike in *Cusick*, he physically touched the defendants, directing them by the arms, and patting them down to check for guns and knives. Gov't Ex. 1 at 7:46:10–7:48:16.   Hughes walked around the vehicle and peered inside the windows. Tr. at 19.   A total of four armed, uniformed officers

eventually were present, standing in a perimeter around the two defendants. Tr. at 62. Hughes confirmed that, at least in his mind, the defendants were not free to leave. Tr. 39–40. While never handcuffing the defendants, brandishing a weapon, or raising his voice, Hughes did direct the defendants to stand at the back of their vehicle. Tr. 80. In totality, this was a sufficient show of authority to indicate to Mestre and Bermudez that they were no longer free to leave. For these reasons, they were detained for Fourth Amendment purposes.

## B.     Reasonable Suspicion

Having resolved the threshold question of whether Mestre and Bermudez were detained so as to implicate the Fourth Amendment, the court turns to whether Hughes had reasonable suspicion to support the detention. This is because the police may briefly stop and detain a person for investigatory purposes only upon reasonable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1 (1968); *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). In other words, once an officer detains an individual, the officer must have "'a particularized and objective basis' for suspecting the person stopped of criminal activity." *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (internal citations omitted). Courts must look to the "totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted). "The 'reasonable suspicion' to justify such a stop 'is dependent upon both the content of the information possessed by police and its degree of reliability.'" *Navarette v. California*, 134 S. Ct. 1683, 1687 (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). While reasonable

suspicion is more than merely a hunch, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274 (citation omitted).

In this context, "reasonable suspicion requires that the officer 'be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *United States v. Boyce*, 351 F.3d 1102, 1107 (11th Cir. 2003) (internal citations omitted).   Unusual travel plans, when viewed in the totality of the circumstances, may give rise to reasonable suspicion. *See United States v. Sokolow*, 490 U.S. 1, 9 (1989) (opining that in context traveling 20 hours from Honolulu to Miami to spend only 48 hours there is suspicious); *Boyce*, 351 F.3d at 1109 (holding that "inconsistencies in travel plans can give rise to a reasonable suspicion" and that "conflicting answers about where one is traveling to or from may give rise to a suspicion of drug activity because most drivers know the answers to these questions").   Additionally, although not enough to support reasonable suspicion standing alone, an individual's presence in a high crime area is "among the relevant contextual considerations in a *Terry* analysis." *Wardlow*, 528 U.S. at 124.

Another relevant consideration is whether law enforcement officers articulate a particularized suspicion of a specific crime or simply a suspicion of criminal activity in general. *See United States v. Mastin*, 2018 WL 1005158 (M.D. Ala. Jan. 2, 2018).   Neither the Eleventh Circuit nor the United States Supreme Court has reached the precise question of whether the Fourth Amendment requires reasonable suspicion of a particular crime or of criminality generally, and other courts are split on the issue. *Id.* at *6; *see United States*

*v. Lee*, 311 F.3d 26 (1st Cir. 2003) ("Warrantless investigatory stops are allowable if, and to the extent that, police officers have a reasonable suspicion of wrongdoing—a suspicion that finds expression in specific, articulable reasons for believing that a person may be connected to the commission of a particular crime."); *Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1378 (9th Cir. 1990) ("No matter how peculiar, abrasive, unruly or distasteful a person's conduct may be, it cannot justify a police stop unless it suggests that some specific crime has been, or is about to be, committed, or that there is an imminent danger to persons or property."); *but see United States v. Guardado*, 699 F.3d 1220, 1225 (10th Cir. 2012) ("Direct evidence of a specific, particular crime is unnecessary."); *United States v. Pack*, 612 F.3d 341, 355 (5th Cir. 2010) (holding that reasonable suspicion does not require particularized suspicion of a specific crime). Absent direct guidance from the Eleventh Circuit or Supreme Court, this court will consider whether Hughes articulated reasonable suspicion of any specific crime as an additional factor in assessing the totality of the circumstances, not as a litmus test for constitutionality. *See Mastin*, 2018 WL 1005158, at *7.

Here, the court finds that Hughes had reasonable suspicion to detain the defendants. Even though they were "well dressed" and driving a "very nice car," Tr. at 41, Mestre and Bermudez were sleeping in their car and had parked in a high crime area for more than 24 hours. Tr. at 9 & 16. Hughes testified that their purported travel plans did not make sense to him because people who are merely "passing through" a town are not likely to sleep overnight in a Walmart parking lot. Tr. 16 & 17. Mestre and Bermudez also told Hughes seemingly conflicting stories, first indicating that they were meeting someone in

Birmingham and merely passing through Dothan, but later suggesting that they were meeting someone in both Birmingham and Dothan. Gov't Ex. 1 at 7:44:08–7:44:28. Hughes also noticed that their car contained brand new clothes, still folded, with the tags intact, compounding his suspicion that they were engaged in criminal activity. Tr. 18. While Hughes did not suspect Mestre and Bermudez of a specific crime, Tr. 17, he offered that the area around the Walmart was known for crimes like breaking and entering of cars, drug activity, prostitution, and theft. Tr. 9. The court finds that the defendants' unusual and arguably inconsistent travel plans and explanation for sleeping in the Walmart parking lot, coupled with the new clothes in the car and the fact that they remained overnight in a high crime area provided Hughes with reasonable suspicion to detain them. *Accord United States v. Farmer*, 2008 WL 2397597, at *2 (M.D. Fla. June 10, 2008) (finding that "the call received regarding a suspicious vehicle, the unusual and improper manner in which the vehicle was parked, the high crime area, the fact that Defendant and the passenger were sleeping in broad daylight, and the numerous items and belongings in the vehicle" provided reasonable suspicion to justify detention).

**B.      Length of Detention**

Having found that a detention did occur and that it was supported by reasonable suspicion, the final issue for the court is whether the length of the detention comported with the Fourth Amendment. "[T]he tolerable duration of police inquiries . . . is determined by the seizure's 'mission' . . . that warranted the stop." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015). If the mission of the seizure is complete, law enforcement may not prolong the detention absent reasonable suspicion. *Id.* However, law enforcement may

detain a person "for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring." *United States v. Pruitt*, 175 F.3d 1215, 1220 (11th Cir. 1999). Although the use of a drug-detecting dog does not amount to a search within the meaning of the Fourth Amendment, *Illinois v. Caballes*, 543 U.S. 405 (2005), law enforcement officers may not extend a seizure merely to deploy a drug dog without reasonable suspicion. *See Rodriguez*, 135 S. Ct. at 1615 (holding that an officer may not prolong a stop "absent the reasonable suspicion ordinarily demanded to justify detaining an individual").

The courts sitting within this Circuit often have passed judgment on the appropriate length of a detention. For example, in *United States v. Lopez*, 2017 WL 373454 (S.D. Ala. Jan. 25, 2017), the court found that a traffic stop was not unlawfully prolonged to conduct a canine sniff where the law enforcement officers' conversation with the defendants supported a finding of reasonable suspicion of illegal activity beyond the initial purpose for the traffic stop. There, an officer conducted a traffic stop for an obstructed windshield in Baldwin County, Alabama, and explained to the defendants why he stopped their vehicle. *Id.* at *2. The driver was overly animated in her responses and the passenger appeared nervous, was breathing heavily, and did not make eye contact. *Id.* The driver told the officer about their travel plans, indicating that they were driving from California to Florida after a vacation because driving was cheaper, even though the passenger worked for Southwest Airlines. *Id.* at *2–3. She explained that they planned to drive to California again the next week because they were looking for a place to move, but that she needed to

return to Florida for her waitressing job. *Id.* at *3.  The officer "concluded that this story did not add up, so he extended the stop further to investigate." *Id.*  Conflictingly, the passenger said that the driver did not need to be back to Florida until the next week, and that he was not sure about when they would return to California. *Id.*  As the officer questioned the defendants further, they continued to change their stories, could not provide details about where they stayed and what they did in California, and remained nervous. *Id.* After the driver declined to consent to a search, the officer walked his canine unit around the car, and the dog alerted to the presence of drugs. *Id.* at *3–4.  The court concluded that the stop was not unreasonably prolonged because the officer had developed reasonable suspicion beyond the traffic violation. *Id.* at 6.

Similarly, Hughes' interactions with Mestre and Bermudez supported reasonable suspicion to investigate criminal activity beyond the initial purpose for the encounter. While he initially approached the men for a welfare check, Hughes detained them after developing a reasonable suspicion of criminal activity, as discussed above.  He testified that the purpose of the detention "was to see why they were still there and what they were doing." Tr. 64.  Undeniably, it was constitutionally permissible for Hughes to detain Mestre and Bermudez at least long enough to conduct the "'ordinary inquiries incident'" to this stop, including a check for outstanding warrants. *Rodriguez*, 135 S. Ct. at 1615 (quoting *Caballes*, 543 U.S. at 408) (noting that "[t]ypically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance").

But the purpose of the detention had not been fulfilled just because Hughes received word that the men had no pending warrants because, at that time, he still had not received coherent and consistent explanations for why Mestre and Bermudez were in Dothan and why they had spent the night in the Walmart parking lot.  In *Lopez*, the court found that the defendants' stories did not add up, giving law enforcement reasonable suspicion to investigate further. *Lopez*, 2017 WL 373454, at *3.  Here, Hughes testified that Mestre's and Bermudez' statements regarding their travel plans were inconsistent and illogical, giving him cause to investigate.  Having reviewed the video recording and observed Hughes' testimony, the court finds that Hughes' suspicion was reasonable and that his concerns had not been resolved at the time he walked his drug dog around the defendants' vehicle. *See, e.g.*, Gov't Ex. 1 at 7:53:00–7:53:34 (offering evolving explanations for their travel plans just before Hughes retrieved Xander from his patrol car).  On this record, there is no basis for concluding that the Hughes unreasonably extended the length of the defendants' detention.  It was, therefore, constitutionally permissible for Hughes to continue to detain the defendants while he deployed his drug dog. *See Pruitt*, 175 F.3d at 1220 (finding law enforcement may detain a person "for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring"); *Rodriguez*, 135 S. Ct. at 1612 (deciding that a seizure becomes unlawful only if it is prolonged beyond the time reasonably required to complete the mission of the stop).  Once his dog alerted, Hughes had probable cause to search the vehicle. *Florida v. Harris*, 568 U.S. 237, 247 (2013) (holding that a certified dog's alert

provides probable cause).

## IV.  CONCLUSION

For the foregoing reasons, it is the RECOMMENDATION of the Magistrate Judge that the motions to suppress (Docs. 34 & 38) be DENIED.  It is further ORDERED that the parties are DIRECTED to file any objections to the report and recommendation not later than **October 10, 2018.**  Any objections filed must specifically identify the findings in the Magistrate Judge's report and recommendation to which the party is objecting. Frivolous, conclusive, or general objections will not be considered by the District Court. The parties are advised that this report and recommendation is not a final order of the court and, therefore, is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report and recommendation shall bar the party from a *de novo* determination by the District Court of issues covered in the report and recommendation and shall bar the party from attacking on appeal factual findings in the report and recommendation accepted or adopted by the District Court, except upon grounds of plain error or manifest injustice. *See Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33 (11th Cir. 1982).

DONE this 26th day of September, 2018.

GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE