IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 1:18-CR-239-WKW |
| | ) | [WO] |
| DARRYL URGELLES MESTRE | ) | |
| EDDY RICARDO BERMUDEZ | ) | |

## **MEMORANDUM OPINION AND ORDER**

On September 26, 2018, the Magistrate Judge filed a Recommendation (Doc. # 59) that the motions to suppress filed by Defendants Darryl Urgelles Mestre and Eddy Ricardo Bermudez (Docs. # 34, 38) be denied. Defendants timely objected to the Recommendation. (Docs. # 63, 68.) Upon a *de novo* review of the record and the Recommendation, *see* 28 U.S.C. § 636(b), Defendants' objections are due to be sustained, and the Magistrate Judge's Recommendation is due to be rejected.

## **I. STANDARD OF REVIEW**

When a party objects to a Magistrate Judge's Report and Recommendation, the district court must review the disputed portions *de novo*. 28 U.S.C. § 636(b)(1). The district court "may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions." Fed. R. Crim. P. 59(b)(3). *De novo* review requires that the district court independently consider factual issues based on the record. *Jeffrey S. ex rel. Ernest S. v. State Bd.*

*of Educ.*, 896 F.2d 507, 513 (11th Cir. 1990).  If the Magistrate Judge made findings based on witness testimony, the district court must review the transcript or listen to a recording of the proceedings.  *Id*.  The district court cannot reject a credibility determination without rehearing live testimony.  *United States v. Powell*, 628 F.3d 1254, 1257 (11th Cir. 2010).  But the district court may, without a new hearing, modify findings in a way consistent with the Magistrate Judge's credibility determination.  *See Proffitt v. Wainwright*, 685 F.2d 1227, 1240–41 (11th Cir. 1982).

## II. BACKGROUND

This case involves a police encounter in the parking lot of a Dothan Walmart.  The Recommendation adequately recites the facts, and neither Mestre nor the government disputes them.  Bermudez challenges only two of the Recommendation's findings of fact.  Because these two findings are closely entwined with the Recommendation's legal conclusions, they are discussed in Part III.

## III. DISCUSSION

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend IV.  Thus, there must be a "search" or a "seizure" to trigger the Fourth Amendment's protections.  No party objects to the Recommendation's finding that a seizure occurred here.  But the Recommendation is unclear on

2

precisely *when* the seizure occurred, and that issue is critical to the case. For a seizure to be valid, it must be "justified at its inception." *May v. City of Nahunta, Ga.*, 846 F.3d 1320, 1328 (11th Cir. 2017) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). Thus, the court considers only those "facts available to the officer at the moment of the seizure." *Terry*, 392 U.S. at 21–22; *United States v. Franklin*, 323 F.3d 1298, 1301 (11th Cir. 2003) ("Because Franklin was seized when he was tackled, the officers can consider everything that happened up to that point to establish reasonable suspicion."). Determining when the seizure occurred, therefore, determines what facts the court may consider in determining reasonable suspicion.

The Recommendation appears to find that the seizure occurred when Officer Hughes retained Defendants' identification. Bermudez contends that the seizure occurred the moment Officer Hughes opened the door of the vehicle and began speaking to Defendants. For these reasons, Bermudez is correct, and his objection on that point is sustained.[1]

---

[1] Mestre, unlike Bermudez, does not argue with Recommendation's finding that the seizure occurred when Officer Hughes retained Defendants' licenses. He thus says "the facts should be limited to those available" to Officer Hughes up until he retained Defendants' licenses. (Doc. # 63, at 11.) And those facts, he says, do not support a finding of reasonable suspicion. For the reasons discussed in Part III.A, Bermudez has the better argument. That is, the Fourth Amendment seizure occurred when Officer Hughes opened the door and began questioning Defendants, not when Officer Hughes retained Defendants' licenses.

## A. The seizure occurred when Officer Hughes opened the door and began questioning Defendants.

Not all police–citizen encounters are seizures. The Eleventh Circuit has explained the difference between "police–citizen exchanges involving no coercion or detention," which are not seizures, and "brief seizures or investigatory detentions" (known as *Terry* stops), which do implicate the Fourth Amendment. *United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006).

A person is seized under the Fourth Amendment "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). In determining whether a reasonable person would feel free to leave, courts consider

> whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police.

*Perez*, 443 F.3d at 778 (quoting *United States v. De La Rosa*, 922 F.2d 675, 678 (11th Cir. 1991)). "The ultimate inquiry remains whether a person's freedom of movement was restrained by physical force or by submission to a show of authority." *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011). "[P]olice questioning, by itself, is unlikely to result in a Fourth Amendment violation." *INS v. Delgado*, 466 U.S. 210, 216 (1984).

Several Eleventh Circuit cases address whether police approaching a vehicle to speak to its occupants is a seizure. Those cases consider, among other things, whether the officer blocked the vehicle with his patrol car,[2] whether the person conveyed his consent to speak with the officer,[3] and whether the officer engaged in coercive conduct during the encounter.[4]

None of these cases discusses a situation when an officer, without consent, opens a car door to speak to the occupants. The District of Columbia Circuit did consider such a case, and assumed there was a seizure. *United States v. Brown*, 334 F.3d 1161, 1164 (D.C. Cir. 2003) ("The parties appear to assume that the opening of the car door constituted both a stop and a search for *Terry* purposes, and we do so as well."). In *Brown*, the officer saw a vehicle parked where gunshots had been

---

[2] *See Miller v. Harget*, 458 F.3d 1251, 1257 (11th Cir. 2006) (finding no seizure in part because, even though police blocked his vehicle, driver did not show that he intended to back out of the parking space).

[3] *See United States v. Baker*, 290 F.3d 1276, 1279 (11th Cir. 2002) (finding no seizure in part because driver allowed officer to speak to other persons in the vehicle); *Miller*, 458 F.3d at 1257 (finding no seizure when driver "voluntarily lowered the window" when officer walked up); *United States v. De La Rosa*, 922 F.2d 675, 677 (11th Cir. 1991) (finding no seizure when person walking away from parked vehicle agreed to speak with officer).

[4] *Compare United States v. Carroll*, 591 F.2d 1132, 1135 (5th Cir. 1979) ("The Agents' tapping on the window and their questioning of Appellant *constituted a stop* within the meaning of the Fourth Amendment." (emphasis added)), *and United States v. Thompson*, 712 F.2d 1356, 1359 (11th Cir. 1983) (finding seizure did occur when officer retained occupant's license while asking him about suspicious object in vehicle), *with Baker*, 290 F.3d at 1279 (finding no seizure in part because officer did not display a weapon or use any coercive language or tone when speaking to vehicle's occupants).

reported and decided to investigate. *Id.* at 1163. He approached the vehicle and knocked on the window. *Id.* When he received no response, he cracked the door open and saw the inculpatory evidence. *Id.* The court assumed this was a Fourth Amendment stop and search and went on to analyze whether it was based on reasonable suspicion. *Id.* at 1164.

The court finds that the seizure occurred the moment Officer Hughes opened the car door[5] and began asking Defendants questions. The video shows Officer Hughes, without Defendants' permission, opening the car door and beginning to ask questions without first asking whether Defendants were willing to speak with him. Although Officer Hughes began by asking whether Defendants were all right, the questions quickly moved from a simple "welfare check" to asking where Defendants were from and what they were doing. During this conversation, Officer Hughes was

---

[5] Although Officer Hughes testified that Bermudez opened the car door and Hughes merely finished pulling it open, (Doc. # 56, at 34), the body camera video shows otherwise. *Cf. Scott v. Harris*, 550 U.S. 372, 381 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Though not a "blatant" contradiction, the video shows Officer Hughes approaching the vehicle, peering in the back window, then waving to those inside. The door handle is just outside the camera's view when the door clicks open, but the camera immediately turns back to show Officer Hughes with his right hand on the door handle and his left hand on the side of the door pulling it open. The representation that Bermudez opened the door is also belied by the fact that the video shows Bermudez in a position that would not easily allow him to open the door. The second-row seat is folded down and Bermudez is laying on top of it, with only his upper body visible. One hand appears to be beneath him as he lays on his side, and the other hand is holding a shoe. Had Bermudez moments earlier reached for the door handle, one would expect one hand to be free and near the door. Moreover, the Recommendation found that Hughes opened the door, (Doc. # 59, at 2), and no party objected to that finding. The court therefore finds that it was Officer Hughes, not Bermudez, who opened the door.

6

standing before the open car door, holstered weapon visible, as Defendants laid across the second-row seat. It would have been difficult for Defendants to get out of the car or drive away if they wished. Although the conversation was friendly at first, Officer Hughes initiated contact by opening the door and asking questions without first seeking Defendants' permission. This is evidence not of a consensual encounter, but a show of authority that would have led a reasonable person to believe he was not free to end the conversation and leave. The court therefore finds that the seizure occurred the moment Officer Hughes opened the door and began questioning Defendants.

B. **No reasonable suspicion to support a seizure existed before Officer Hughes opened the door and began questioning Defendants.**

The Recommendation concludes there was reasonable suspicion justifying a seizure based largely on events occurring *after* the seizure, including Defendants' unusual travel plans, their explanation for sleeping in the Walmart parking lot, and the new clothes in the car.[6] But Officer Hughes ascertained this information *after* he opened the door and began questioning Defendants; *i.e.*, after the seizure had

---

[6] Bermudez objects to the Recommendation's finding that Officer Hughes "noticed that their car contained brand new clothes, still folded, with the tags intact, compounding his suspicion that they were engaged in criminal activity." (Doc. # 59, at 12.) That objection is sustained. The body camera video shows that when Officer Hughes opened the door, there were some clothes underneath Bermudez as if he had been sleeping on top of them, but they are rumpled up and no tags are immediately visible. Officer Hughes discovered the "new clothes" upon a full-fledged search of the vehicle. And that information arose well after Defendants were seized.

7

occurred. Because a seizure must be justified from its inception, the court considers only the facts available to Officer Hughes at the moment he opened the car door and began questioning Defendants.

That leaves only three facts based on which Officer Hughes could have suspected wrongdoing: (1) Officer Hughes had seen the two men in the parking lot the day before;[7] (2) they were present in a high-crime area; and (3) they were asleep in a late-model SUV. These facts do not support reasonable suspicion.

An officer "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Terry*, 392 U.S. at 30. The officer must articulate "a particularized and objective basis for suspecting the particular person stopped of criminal activity," *United States v. Cortez*, 449 U.S. 411, 417–18 (1981), not merely an "inchoate and unparticularized suspicion or 'hunch' of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (quoting *Terry*, 392 U.S. at 27). "The 'reasonable suspicion' to justify such a stop 'is dependent upon both the content of

---

[7] Bermudez objects to the Recommendation's finding that Defendants "had parked in a high crime area for more than 24 hours." (Doc. # 59, at 11.) That objection is sustained. Hughes admitted on cross-examination that he did not know "whether the vehicle had moved and come back or was just there for 24 hours." (Doc. # 56, at 30.) He also admitted that the vehicle was not in the same spot, but the same general area. (Doc. # 56, at 29.) It is unremarkable that someone would visit Walmart two days in a row. So without other evidence, seeing the same vehicle in the Walmart parking lot on two consecutive days does not prove it was there the entire period. Thus, Bermudez' objection is sustained on the Recommendation's finding that Defendants remained in the parking lot for 24 hours.

the information possessed by police and its degree of reliability.'" *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). "[R]easonable suspicion requires that the officer 'be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *United States v. Boyce*, 351 F.3d 1102, 1107 (11th Cir. 2003) (quoting *United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir. 1990)). Whether there is a particularized and objective basis for the officer's suspicion is based on the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

Officer Hughes did not articulate a "particularized and objective basis" for thinking that Defendants had engaged or were about to engage in criminal activity. The three facts available to Officer Hughes at the time of the stop do not support reasonable suspicion. First, seeing the same two people on consecutive days at a major retail store is hardly suspicious. To state the contrary would be "very likely to sweep many ordinary citizens into a generality of suspicious appearance." *United States v. Rodriguez*, 976 F.2d 592, 595–96 (9th Cir. 1992). Second, while an individual's presence in a high crime area is among the "relevant contextual considerations" in the reasonable-suspicion analysis, this fact, "standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Wardlow*, 528 U.S. at 124 (citations omitted). Nor does an

individual's presence in a high-crime location on two consecutive days support reasonable suspicion, especially when that location is the most popular retailer in America. *See* Jessica Tyler, *These Are the 20 Biggest Retailers in America*, Business Insider (Aug. 13, 2018, 12:56 PM), https://www.businessinsider.com/biggest-retailers-in-america-based-on-sales-2018-8. Finally, that Defendants were sleeping in their late-model SUV does not support reasonable suspicion. This fact "would likely apply to a considerable number of those traveling for perfectly legitimate purposes" and does not "reasonably provide . . . suspicion of criminal activity." *Boyce*, 351 F.3d at 1109 (quoting *United States v. Smith*, 799 F.2d 704, 707 (11th Cir. 1986)).

Three other facts are worth noting. First, there is no evidence Officer Hughes received a complaint about Defendants' presence in the Walmart parking lot. Second, Defendants did not appear furtive or nervous when Officer Hughes began questioning them. Finally and most importantly, Officer Hughes could not articulate why Defendants' otherwise-innocent behavior led him to suspect that criminal activity was afoot, or what sort of criminal activity he suspected. Because Officer Hughes did not have reasonable suspicion to justify the stop, his later search of the vehicle was also unjustified under the Fourth Amendment.

## IV.  CONCLUSION

For these reasons, Officer Hughes's search and seizure violated Defendants' Fourth Amendment rights.  The Recommendation is therefore rejected, and Defendants' motions to suppress are granted.

It is ORDERED as follows:

1. The Magistrate Judge's Recommendation (Doc. # 59) is REJECTED to the extent discussed herein;

2. Defendants' objections (Doc. # 63, 68) are SUSTAINED to the extent discussed herein; and

3. Defendants' motions to suppress (Doc. # 34, 38) are GRANTED.

DONE this 23rd day of January, 2019.

/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE